E. Wheeler Bryant and Emma M. Bryant v. Commissioner.
Bryant v. Commissioner
Docket No. 89548.
United States Tax Court
T.C. Memo 1963-199; 1963 Tax Ct. Memo LEXIS 143; 22 T.C.M. (CCH) 975; T.C.M. (RIA) 63199; July 29, 1963
deQuincy V. Sutton, 214 Dixie Towers, Meridian, Miss., for the petitioners. Homer F. Benson for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax against the petitioners for the taxable year 1958 in the amount of $39,276.68, together with an addition to tax of $99.08 under section 6654 of the Internal Revenue Code of 1954, for underpayment of estimated tax. The issues presented are whether the petitioner E. Wheeler Bryant realized taxable income, *144 as compensation for services, of $55,897.54 by the receipt of a 10% interest in two tracts of land in Mississippi, referred to hereinafter as the Ranch, and $10,600 by the receipt of a 4% interest in a North Carolina timber tract, referred to as Pamlico; and whether he is liable for an addition to tax for underpayment of estimated tax. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. The petitioners are, and were during the taxable year 1958, husband and wife residing in Hattiesburg, Mississippi. They filed a joint Federal income tax return for such year with the district director of internal revenue for the State of Mississippi, on the cash receipts and disbursements method of accounting. E. Wheeler Bryant, hereinafter referred to as the petitioner, is an experienced timber estimator and has been engaged for many years in the business of managing and supervising the purchase, operation and sale of lands, timber and mineral rights. Beginning in 1942 the petitioner, pursuant to an oral agreement, and a written power of attorney dated June 13, 1942, purchased land, timber and mineral rights in Mississippi for William A. Powe who, *145 until 1958 when he moved to Hattiesburg, Mississippi, was a dealer in farm machinery in Havana, Cuba. Under the power of attorney petitioner was given the authority to do all acts necessary to carry out the agreement, including the buying, managing and selling of lands, timber and mineral rights at his discretion. Powe maintained a bank account. Under a power of attorney the petitioner was authorized to make deposits to and withdraw funds from this account in connection with the purchase and sale of property, and to execute and cancel deeds of trust. On March 12, 1951, the oral agreement between Powe and the petitioner was reduced to writing in the form of a letter addressed by Powe to the petitioner and assented to by the petitioner. Under such agreement Powe agreed to furnish all the money to buy lands and mineral rights, and to pay taxes, legal fees and incidental out-of-pocket expenses. The petitioner agreed to do all the work in finding tracts of land and mineral rights to be purchased and in managing and controlling the ventures. The agreement described several properties which had been acquired under the oral agreement, and provided: * * * As a matter of convenience between *146 us, it was and is agreed between us that the legal title to all of the lands and mineral rights would be taken in my name and held in my name. * * * When any purchases of lands or mineral rights are made, you are to be paid by me five percent of the cost of any such purchases. When any sale is made, either of lands or mineral rights or any interest in either, or any oil lease is sold on any part of the property or when any rentals or other income is received from the said lands and mineral rights, one tenth of the proceeds thereof belongs to you and the remaining nine tenths belongs to me. As I have said above, the legal title to all of the lands and mineral rights stands in my own individual name, but our agreement is now and has from the beginning been that you own a one tenth interest and I own a nine tenths interest in all of the lands and mineral rights in the State of Mississippi, the title to which stands in my name. * * *
It is of course agreed between us that in the future additional tracts of land or interest in the mineral rights or royalty interest in other tracts of land may be acquired in the State of Mississippi, the title to which will be taken in my name and *147 which will be handled and managed by you; and in all such cases of future acquisitions the same will be covered by the agreement set forth in this letter. It was also provided that the agreement should continue in effect indefinitely, but could be terminated at any time by either party by written notice given to the other. It was further provided that upon termination of the agreement Powe would execute and deliver to the petitioner proper deeds and conveyances transferring to the petitioner the legal title to the one-tenth interest owned by him in the several properties covered by the agreement. It was also provided that even though the agreement should not be terminated, Powe would transfer to petitioner his one-tenth interest at any time that the petitioner desired. Such was the relationship obtaining between petitioner and William A. Powe in August 1957, when the first of the two real property transactions here in issue were initiated. Mississippi Transaction - The Ranch On August 13, 1957, Powe, by the petitioner as attorney in fact, entered into an agreement, referred to therein as "option and escrow agreement," with B. A. Cogle, Sr. and his wife, wherein the Cogles granted *148 Powe an option to purchase two tracts of land in Mississippi (referred to as the Ranch) and certain personal property in connection therewith. The stated purchase price was $532,357.50, of which amount $156,900 was to be paid in cash and the balance of $375,457.50 was to be evidenced by two notes of the purchaser, one in the amount of $9,157.50, payable 10 days after the date of closing of the sale, and the other in the amount of $366,300, payable 5 years after the date of closing, both bearing interest at 5%. [1] It was provided that the option agreement should extend for a period ending on March 15, 1958. It was also provided that Powe would, immediately upon the execution of the option, deposit the sum of $156,900 with a bank. The bank was to hold this sum in escrow and, upon the exercise of the option, pay it to the sellers as part of the purchase price of the property. *149 On August 20, 1957, Powe, acting through the petitioner as attorney in fact, and the Cogles entered into an escrow agreement with the Bank of Thomasville, Thomasville, Alabama, pursuant to which Powe deposited with such bank the sum of $156,900. In such agreement the Cogles agreed that on or before March 15, 1958, they would deliver to the bank a properly executed deed conveying the property to Powe, and Powe agreed to deliver to the bank the two interest-bearing notes referred to above and an executed deed of trust on the property to secure the payment of the notes. It was recited in the escrow agreement that the Cogles did not then have title to the property in question but that they had an agreement to acquire it, together with a policy of title insurance, from the then owner, by September 1, 1957. It was provided in the escrow agreement that if the Cogles did obtain the title policy from the then owner, Powe would accept the title policy as conclusive evidence of a good title; that if the Cogles did not obtain the title and title policy by September 1, 1957, then the March 15, 1958 expiration date of the option should be extended by as many days as might elapse between September 1, 1957, and *150 the date on which such title and title policy should be obtained by the Cogles; that if, however, the Cogles did not obtain the title and title policy by November 1, 1957, Powe had the right to cancel the escrow agreement and the option contract, and withdraw the deposit of $156,900; and that if, within the option period, the title and title policy having been timely obtained, Powe should fail to execute and deliver to the escrow agent the two promissory notes and the executed deed of trust, then the amount of $156,900 should be forfeited to the Cogles, and the escrow agent should return the deed to them. Powe obtained the $156,900 deposited in escrow by borrowing, through the petitioner as his attorney in fact, the amount of $170,000 from the First National Bank of Hattiesburg, Mississippi, on August 20, 1957. Out of the loan there was also paid to a realtor conditionally the sum of $12,000. It was understood between the bank and the petitioner, in accordance with the procedure established by other transactions over a number of years, that when the property was purchased it would be mortgaged to the bank to secure the loan. By letter of March 4, 1958, Powe, by petitioner as attorney *151 in fact, notified the Cogles of his intention to exercise the option to purchase the property in question upon the furnishing of a title insurance policy, despite the fact that he had the right to cancel his entire contract since the Cogles had not obtained a policy of title insurance by November 1, 1957, as required, stating that it was his understanding that the title insurance policy would be obtained shortly. As of April 22, 1958, the required policy of title insurance with respect to the Ranch had not been obtained by the Cogles. With consent of the petitioner evidenced by his signature thereto, a trust, known as the William A. Powe Trust, was created, and various properties and interests held in Powe's name (described in Exhibit "A" to the instrument) were transferred to the Deposit Guaranty Bank & Trust Co. of Jackson, Mississippi, as trustee. Included in the property transferred to the trust was the option. In this connection paragraph (4) of Article I of the instrument provides: One of the properties transferred to the Trustee is a purchase contract on two tracts of land * * * entered into in the form of an option from B. A. Cogle, Sr. and Rosa L. Cogle to William A. Powe, *152 dated August 13, 1957, as amended * * * and acceptance of said option by William A. Powe under date of March 4, 1958. The Trustee in its capacity as Trustee hereby assumes and is to be primarily liable for any liabilities or debts arising out of said purchase contract, and the Trustee is hereby directed and authorized to perform all acts and obligations necessary to acquire the Simmons Tract and the Pine Hill Ranch Tract under the above referred to purchase contract. In performing said contract the Trustee is hereby authorized to do any and all things necessary or desirable to consummate the purchase of said lands, including but not limited to the execution of notes, deeds of trust and any and all other documents in connection with the purchase of said properties. The Trustee is hereby authorized to pay any debts incurred in connection with the purchase of said lands out of either income or corpus or partly from income and partly from the corpus, as the Trustee in the exercise of its sole discretion may determine to be for the best interest of the trusts created by this instrument, provided that until all of the indebtedness incurred in connection with the option is repaid all of the *153 net income from the trust properties will be applied to the cancellation of such indebtedness subject to the provisions of paragraph (1) of Article II and paragraph (3) of this Article. By paragraph (2) of Article I of the trust instrument the trustee, as such, assumed and became primarily liable for debts and encumberances totaling $457,975.90 (plus interest of $425.41). The trustee, as such, also assumed and became primarily liable for any other liabilities which constituted liens against all or any of the properties transferred in trust. In this connection paragraph (3) of Article I of the trust instrument provides: The debts assumed by the Trustee under the above provision were incurred in connection with the purchase of the properties transferred to the Trustee, and the Trustee is hereby directed and authorized to pay said debts and liabilities out of either income or corpus or partly from income and partly from corpus as the Trustee in the exercise of its sole discretion may determine to be for the best interest of the trusts created by this instrument. Provided that until all of the indebtedness assumed under paragraph (2) of this Article I is paid the net income from the *154 trust properties will be applied to the can ellation of such indebtedness subject to the provisions of paragraph (1) of Article II. The trust instrument recites that all the properties transferred in trust (described in Exhibit "A") were "properties which the Settlor has acquired under the terms of an agreement with E. Wheeler Bryant * * * reduced to writing in a letter from the Settlor to Mr. E. Wheeler Bryant dated March 12, 1951." It was further recited that under the terms of the agreement of March 12, 1951, the petitioner was the owner of an undivided one-tenth interest in all of the properties described in Exhibit "A" and that under the terms of such agreement the undivided one-tenth interest owned by the petitioner in certain of such properties (listed on an attached Exhibit "C") was not to be reduced because of any indebtedness which might be a lien against such properties, since Powe was obligated to pay such indebtedness. The properties listed in Exhibit "C" consisted of the properties which had been acquired by Powe under his oral agreement with the petitioner and which had been listed in the written agreement of March 12, 1951, between Powe and the petitioner. They did *155 not include the above mentioned option or the property subject to the option. In the trust instrument, the trustee was directed, in order to satisfy the claim of the petitioner to the properties listed on Exhibit "A", to set aside one-tenth of the trust properties in a separate trust for the use and benefit of the petitioner. In this connection paragraph (1) of Article II of the trust instrument provides: Subject to the provisions of Article I and net annual income from said separate trusts will be paid to E. Wheeler Bryant in convenient installments at least annually, provided, that from the date of the creation of this trust E. Wheeler Bryant shall be entitled to receive in convenient installments one-tenth of the net annual income produced from the properties described on the attached Exhibit "C", and said income will not be applied to the payment of interest or principal of any debts presently existing or incurred under the provisions of Article I, nor shall any of said income be applied to the payment of Trustee's fees, ad valorem taxes or other expenses of the Trust until after the death of E. Wheeler Bryant as hereinafter set forth. The trust instrument further provided *156 that at any time during the lifetime of the petitioner he might require the trustee to convey to him or to such person as he might direct all or any portion of the property held under the separate trust; and that upon his death the entire remaining principal and uncollected or undistributed income of the separate trust should be paid over to such persons as he might appoint by will, or upon failure to appoint, then to his next of kin. In an exhibit to the trust instrument the value assigned to the Exhibit "A" properties was $762,722.20, which included under the heading "Purchase Contract" an amount of $156,900 for the Ranch and $139,440 for the personal property in connection therewith. Therein the liabilities to which the properties were subject were stated to be in the amount of $458,401.31, of which $410,471.95 was owed to the Deposit Guaranty & Trust Co., secured by deed of trust covering all the properties conveyed by Powe to the bank as trustee. This indebtedness included an amount of $170,000 advanced by Deposit Guaranty Bank & Trust Co. to repay the First National Bank of Hattiesburg that amount which had been borrowed by Powe to make the escrow deposit. (The Ranch property *157 at some time became subject to the mortgage in favor of the Deposit Guaranty Bank & Trust Co.) Thus, the stated net value of the trust properties was $304,320.89. At some time between April 22, 1958 and July 16, 1958, the required policy of title insurance on the Ranch was furnished by the Cogles, and the trustee exercised the option to purchase the Ranch property. It thereupon assumed liability, in accordance with the trust instrument, for indebtedness representing the full purchase price of the Ranch property, which indebtedness was an encumbrance upon the property. Powe personally became secondarily liable for the payment of such indebtedness. At no time material herein did Powe personally make any payment upon such indebtedness. At some time in 1957 the petitioner was paid by Powe the amount of $26,617.87, representing a commission of 5% of the purchase price of the Ranch property, including the personal property in connection therewith. In his income tax return for the taxable year 1957 the petitioner reported this amount as ordinary income. On February 3, 1961, the petitioner filed a request in writing with the trustee "to convey and deliver to me * * * all of my right, *158 title and interest in and to the property in the William A. Powe Trust U/A of April 22, 1958." Thereafter by letter of May 8, 1961, the petitioner modified the request and sought conveyance of only an undivided one-tenth interest in the oil, gas, mineral and royalty rights in the properties listed on Exhibit "C", free and clear of any encumbrances. On May 11, 1961, the trustee of the trust filed in the Chancery Court of Hinds County, Mississippi, a petition for approval of its first, second, third and final accounting, covering the period of trust administration from April 22, 1958 through March 31, 1961, and for a determination of the rights of E. Wheeler Bryant in the trust property. The accounting commenced with a net value of trust assets as of April 22, 1958, of $304,320.89, and reflected a March 31, 1961, net value of $312,265.24, arrived at as follows: Net Value of Trust on 4-22-58
$ 304,320.89
Add: Net Increase of Property Disposed of, over book value
4,605.93
Receipts from Operations
343,428.80
Receipts from Loans
225,000.00
Book Value of Assets Acquired and Gifts ($16,590)
447,394.31
$1,324,749.93
Less: Cash Paid for Assets
$ 32,649.61
Net Liabilities Assumed
$377,976.62
Accrued Interest
18,130.96
396,107.58
Payments on notes (principal)
229,419.39
Payments on notes (interest)
113,377.57
Distributions - Beneficiaries (sisters)
25,600.00
Distribution to E. Wheeler Bryant
12,984.37
Distributions for Operations
202,346.17
$1,012,484.69
Net Value of Trust on 3-31-61
$ 312,265.24
*159 The Chancery Court, by decree of August 11, 1961, approved the trustee's accounting for the period involved, and construed the rights of the petitioner E. Wheeler Bryant in the properties and income of the trust. It held in effect, among other things, that the trust was revocable as to the interest of the petitioner therein; that he had a one-tenth interest in the value of the Exhibit "C" properties, such value to be determined without deduction therefrom of any debts of any kind, and that he was entitled to a distribution of such interest, free and clear of any charge or encumbrance; that he had a one-tenth interest in other properties originally conveyed to or subsequently added to the trust, but subject to all liens thereon and other debts of the trust, including trustee fees, ad valorem taxes or other expenses; that he was entitled to one-tenth of the net income produced by the properties described in Exhibit "C", but that all the other net income of the trust was to be applied to the payment of debts which were secured by liens on the trust properties until such debts were paid in full; that the trust was indebted to the Deposit Guaranty Bank & Trust Co. in the amount of $429,025.63 *160 principal and $21,075.66 interest; and that Powe personally was secondarily liable for such debts. After the creation of the trust the petitioner continued to give advice to the trustee with respect to the purchase, sale and management of the property. However, he was not employed by the trust or paid by it. The petitioner did not at any time report as income any amount respecting his one-tenth interest in the Ranch. In the notice of deficiency for the taxable year 1958, the respondent determined that the petitioner had additional income from the Ranch transaction in the amount of $55,897.54, with the following explanation: It is determined that your taxable income for this taxable year includes compensation for services rendered in connection with acquisition of Pine Hills Ranch and Simmons property acquired on behalf of William A. Powe and William A. Powe Trust and in which you acquired a 10 percent interest. Such compensation is computed at 10 percent of the purchase price of $558,975.37 or $55,897.54. Accordingly, your reported taxable income has been increased by such amount. The purchase price of $558,975.37 determined by the respondent includes the contract price of *161 $532,357.50 and the amount of the 5% commission of $26,617.87. North Carolina Transaction - Pamlico Property In August, 1958, the petitioner, acting under a specific power of attorney, executed by Powe for the purchase of property in North Carolina, purchased in Powe's name a 75% undivided interest in a tract of timber land in that state consisting of approximately 73,000 acres (hereinafter referred to as the Pamlico property). Powe's purchase was made upon petitioner's recommendation. Simultaneously J. P. Smith purchased an undivided 25% interest in this tract. The total purchase price of the property was $2,415,000, of which sum $225,000 was paid at the time of purchase, and the purchasers agreed to pay jointly and severally in serial payments, secured by deeds of trust, the balance of the purchase price, which included the assumption of an outstanding mortgage in the amount of $1,250,000. The owners, Powe and Smith, selected the name Pamlico Development Co. as a trade name of convenience for ownership and operation of the property, appointed petitioner as business "trustee," and paid into the venture two payments of $20,000 each during August and September 1958. The total *162 cash, including the down payment on the purchase price, paid in by mid-September was $265,000. At some undisclosed time the venture borrowed money from a bank to meet operating expenses. At some time before mid-September 1958, Powe sold to Roger W. Stribling and G. Harold King, Jr. each a 12 1/2% undivided interest in the property, leaving him with a 50% undivided interest. Thereafter, at some time prior to mid-September 1958, and after the payment of the above referred to amount of $265,000, the four then owners transferred to the petitioner a 4% undivided interest in the property. This transfer was at no cost to the petitioner, and thereafter he was treated as owner to that extent, paying his 4% share of all expenses and payments on the notes representing the unpaid balance of the purchase price of the property. Later three other individuals, Duke, Wright and Higgason, received from Smith fractional undivided interests in the property. Upon petitioner's appointment as "trustee" of the operation the then owners agreed to pay him for his services $1,000 per month, plus his expenses to and from the operation. Petitioner's duties, performed on a part time basis, consisted of preparing *163 payrolls, paying for supplies, consulting with employees, including a manager and a foreman, and attending to the sale of timber. For a while petitioner received a salary of $1,000 per month, and in his income tax return for 1958 he reported $3,000 of salary so received. Thereafter he received no salary, because of shortage of funds of the venture. In the monthly statements prepared by the petitioner for the venture, he continued for about 24 months to accrue salary to himself at the same rate (although such salary was not paid to him), until the owners offered the property for sale. [2] Smith for a while was employed full time for managment of the property and received $1,000 per month for an unspecified time. The venture consisted of the cutting and sale of timber. It was also planned to clear the land for sale for agricultural purposes. It was necessary to reduce the water level on the property *164 in order to permit entry of equipment for logging. This necessitated the digging of ditches. The dirt excavated was used in building roads for the purpose of hauling the timber out. One of the mortgages which was assumed required the owners to operate some ditch digging and road building machinery all the time. In his income tax return for the taxable year 1958, the petitioner claimed as a deduction, which was allowed by the respondent, an amount of $3,590.14 as his 4% share of an $89,753.89 operating loss sustained by the Pamlico property venture for that year. Attached to such return was the following tabulation of expenditures of the venture for such year: Item
Particulars
Amount
Total
1.
Interest paid on indebtedness
$73,330.31
2.
Insurance against fire and liability respecting timber stands and
operations
6,986.00
3.
Executive salaries
$6,725.00
4.
Telephone and telegraph
390.84
5.
Travel and auto expense
891.18
6.
Administrative expense and supplies
356.41
8,363.43
7.
Legal expense for current services
1,060.00
8.
Taxes to State of North Carolina
11.05
9.
Maintenance of administrative vehicle
3.10
10.
Total - Operating loss for the year
$89,753.89
*165 Such attachment to the return does not disclose the receipt of any income by the venture in the year 1958. The above amount of $40,000 paid in to the venture by Powe and Smith in August and September 1958 was used in part for operating expenses, in part for buying equipment, and in part for the beginning of operations of ditch digging and road building. Of this $40,000 sum, the amount of $10,000 was used for operating expenses which did not enhance the value of the property, and the remainder was expended for equipment and for improvements which did increase the value of the land. In his income tax return for the taxable year 1958, the petitioner did not report as income any amount on account of the receipt of the 4% undivided interest in the North Carolina tract which he received in 1958. In the notice of deficiency the respondent increased the petitioner's reported income by the amount of $10,600 on account of the receipt of the 4% interest in the Pamlico property with the following explanation: It is determined that your taxable income for this taxable year includes $10,600.00 compensation for services performed in connection with Pamlico Development Company, computed at *166 4 percent of $265,000.00. * * * The value of the 4% undivided interest which petitioner received in the Pamlico property in 1958 was $10,200. It was received in consideration for his services rendered or to be rendered "as trustee" in the management of the Pamlico property venture. Underpayment of Estimated Tax In their joint income tax return for the taxable year 1958, the petitioners reported income tax due in the amount of $6,476.38. Therein they showed tax withheld in the amount of $977.29 and payments of estimated tax of $450. In the notice of deficiency the respondent computed an addition to tax in the amount of $99.08 under section 6654 of the Internal Revenue Code of 1954 for failure to pay estimated tax. In such computation he treated as estimated tax paid by the petitioners the amount of tax withheld of $977.29 and actual payments of estimated tax of $300, or a total of $1,277.29. Opinion The respondent held, and contends, that the petitioner is taxable in 1958, at ordinary income tax rates, upon one-tenth of the purchase price of the Ranch property, such purchase price having been determined by him to be $558,975.37, consisting of the *167 contract price of $532,357.50, plus the 5% commission of $26,617.87 paid to the petitioner by Powe. It is his position that the purchase of this property was initiated under the general agreement of March 12, 1951, between the petitioner and Powe; that under such agreement the petitioner was not to be personally liable for any portion of the purchase price; that Powe and the petitioner transferred the option for the purchase of the property into the trust; that when the trust exercised the option, the petitioner received a one-tenth interest therein, which he reserved the right to withdraw from the trust; that the petitioner remained not liable personally for any portion of the purchase price, the trust being primarily liable, and Powe secondarily liable; that the value of the trust assets at all times exceeded the liabilities by a sufficient amount to pay the indebtedness of the trust without affecting the petitioner's one-tenth interest in the Ranch property; that therefore the petitioner realized income when the option was exercised and the Ranch property was purchased by the trust in 1958, in the amount of the fair market value of his one-tenth interest in the property; and that *168 such fair market value is not less than one-tenth of the cost of the property. He states that the petitioner realized taxable income to the same extent he would have if Powe had taken title for himself and petitioner, rather than having the trust take title. He cites Helvering v. Horst, 311 U.S. 112, for the proposition that a taxpayer cannot avoid the realization of taxable income by assigning or transferring his rights to any salary or property for services performed or to be performed. The petitioner contends that although the Chancery Court of Hinds County, Mississippi, decreed that he had a right to a 10% interest in the Ranch property, that court also held that he would not be allowed to receive it until all debts for which it was liable were paid; that any interest which the petitioner had in the property was at most 10% of the property, subject to 10% of its debts; and that he was not in receipt of income in 1958 upon the transaction since the debt to which the property was subject was equal to the value of the property. We are of the opinion that the petitioner is correct in his contention that in 1958 he was not in receipt of taxable income on account of *169 the Ranch property. Had Powe exercised the option, instead of transferring it to the trust, the petitioner would, pursuant to the agreement of March 12, 1961, have received an undivided one-tenth interest in the Ranch property. Under such agreement of March 12, 1951, Powe would have been liable for the full purchase price, and the petitioner would not have been personally liable. However, the full property, including the petitioner's interest therein, necessarily would have been encumbered by mortgage covering the purchase price. Presumably under such agreement of March 12, 1951, the petitioner would have been entitled to any income derived from his undivided one-tenth interest in the property. However, if the transaction had been so consummated, any interest which the petitioner obtained would have had no fair market value at the time of acquisition, and hence the petitioner would not have been in receipt of taxable income at that time, for the reason that it was contemplated that the full amount of the purchase price, including the $170,000 borrowed by Powe in order to make the $156,900 down payment, would have been a charge against the entire property under mortgage. To this extent *170 this particular purchase was to be different from some of the prior purchases of property in which Powe made a down payment, thereby creating in petitioner a valuable interest. We see no essential difference, from a tax standpoint, between that situation and the one arising by the method of acquisition which was actually employed. When the trust exercised the option and acquired the property, the petitioner was not personally liable for payment of the purchase price, the trustee being primarily liable according to the terms of the trust, and Powe personally being secondarily liable. Upon acquisition of the property by the trust, the full purchase price was represented by indebtedness which was a charge upon the property. And it may be added that, under the trust instrument, the full amount of income from the Ranch property, including that accruing to petitioner's undivided interest therein, was committed to the payment of the indebtedness on this property and other trust properties until all such indebtedness was paid. In this respect the petitioner was perhaps in a more unfavorable position than he would have been had the option been exercised by Powe individually. As stated above, *171 the respondent's contention is that the petitioner derived income at the time of acquisition of the Ranch property by the trust, such acquisition being sometime between April 22, 1958 and July 16, 1958. Since, as pointed out above, the full purchase price was represented by indebtedness which was an encumbrance upon the property, we think it clear that the petitioner was not in receipt of taxable income at the time of acquisition of the property. The net value of the trust assets, and hence the value of petitioner's interest therein, was not increased to any extent by the acquisition by the trust of such property. The respondent does not contend that thereafter, in the remainder of 1958, anything transpired which would result in the receipt of taxable income by the petitioner in respect of the Ranch property. It may be noted, however, that the record as a whole indicates that Powe did not, at any time material herein, personally make any payments on the indebtedness on any of the trust property pursuant to his secondary liability. The petitioner testified that all the indebtedness with respect to the Ranch property remained unreduced at the end of the taxable year 1958. In view *172 of the foregoing, we hold that the respondent was in error in including in the petitioner's income for the taxable year 1958 any amount on account of the Ranch transaction. With respect to the second issue involved herein, we think the petitioner was in receipt of ordinary income as a result of his receipt in 1958 of an undivided 4% interest in the Pamlico property in North Carolina. Such property had been purchased by Powe and Smith at a price of $2,415,000, of which sum $225,000 was paid by Powe and Smith at the time of purchase. It is clear, we think, that petitioner's undivided interest in such property had a value of at least 4% of the equity in the property of $225,000, or $9,000. While petitioner apparently became personally liable for his share of the remainder of the purchase price, and his interest was encumbered for the same, this was not true as to the $225,000 of the purchase price which had been paid before he received his interest. Petitioner paid no amount for such interest, the only consideration on his part being services rendered or to be rendered by him in managing the venture for all the owners. The testimony of both Powe and one of the other co-owners, Stribling, *173 was to the effect that this interest in the property was given to petitioner to insure the retention of his services in managing the property. There was clearly no intention to make a gift to the petitioner. Compensation received in the form of property is taxable as ordinary income to the extent of the fair market value of such property. Section 61(a) of the Internal Revenue Code of 1954, and section 1.61-2(d) of the Income Tax Regulations promulgated thereunder. See S. Rept. No. 1622, 83d Cong., 2nd Sess., p. 168. See also Commissioner v. LoBue, 351 U.S. 243. There had also been contributed by Powe and Smith to the venture, prior to the acquisition by the petitioner of his interest in the property, an amount of $40,000. The respondent has included this $40,000 in the computation of the value of the interest which the petitioner received in the property. This amount was not used to make payment on the original purchase price. Rather, according to the testimony of the petitioner, it was used for payment of operating expenses, the purchase of some equipment, and for cost of ditch digging and road building. The petitioners *174 have not shown the amount expended for each purpose. Of course, any amount used to pay current expenses would not increase the value of the property. On the other hand, any portion expended for ditch digging and road building may well have enhanced the value of the property. Furthermore, we think it must be assumed that the petitioner received a 4% interest in any equipment which may have been purchased with a part of the $40,000. In this situation we are faced with the difficult task of determining upon very meager evidence the portion of the $40,000 expended in 1958 which contributed to the enhancement of the value of the interest which the petitioner received in that year. Under the circumstances, we have, pursuant to the rule of Cohan v. Commissioner, 39 F. 2d 540, exercised our best judgment and, bearing heavily against petitioner who has the burden of proof, have concluded and found as a fact that the expenditure of $10,000 of the $40,000 did not increase the value of the property in which the petitioner obtained an interest, and that the expenditure of $30,000 did. The fair market value of the petitioner's 4% undivided interest in the property was $10,200. We accordingly *175 hold that in 1958 the petitioner was in receipt of ordinary income in that amount on account of the receipt of his interest in the Pamlico property. The respondent determined that there was due from the petitioners an amount of $99.08 as an addition to tax under section 6654 of the Internal Revenue Code of 1954[3] for underpayment of estimated tax. *176 The petitioners contend that there is no deficiency and that therefore no addition to tax is due. It appears from the deficiency notice that the respondent computed the amount of petitioners' underpayment of estimated tax on the basis of the tax shown on their return for the taxable fear 1958, and not in any way by reference to the amount of deficiency determined by him on account of alleged unreported income with respect to the Ranch and Pamlico properties. This was clearly in accord with the statute. In his determination the respondent held that the amount of estimated tax actually paid was less than the petitioners reported, in their return, that they had paid. The petitioners have not adduced any evidence to show that the respondent's determination in this respect is incorrect, and such determination is approved. Decision will be entered under Rule 50. Footnotes
1. Later, by letter of September 17, 1957, from Powe, through petitioner as his attorney in fact, to the Cogles, the terms of the option and escrow agreement were modified to provide that Powe would assume two outstanding mortgages (in an undisclosed amount) against the property and reduce by the same amount the notes which he had agreed to give the Cogles in payment for the property.↩
2. At about the time of the trial of this case, in February 1962, there had been invested in the property the amount of about $1,100,000, and the remaining indebtedness was about $2,150,000. At that time the property was being offered for sale at $3,000,000, less a commission of $200,000.↩
3. Section 6654 of the Code provides in part as follows: (a) Addition to the Tax. - In the case of any underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under chapter 1 for the taxable year an amount determined at the rate of 6 percent per annum upon the amount of underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)). (b) Amount of Underpayment. - For purposes of subsection (a), the amount of the underpayment shall be the excess of - (1) The amount of the installment which would be required to be paid if the estimated tax were equal to 70 percent * * * of the tax shown on the return for the taxable year or, if no return was filed, 70 percent * * * of the tax for such year, over (2) The amount, if any, of the installment paid on or before the last date prescribed for such payment.↩